JEG:PNK:SK
F.#2010R01452

# M-10-1090

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

BORIS SACHAKOV,

         Defendant.

- - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
AN ARREST WARRANT

(T. 18, U.S.C., §§ 1347 and
  3551 et seq.)

EASTERN DISTRICT OF NEW YORK, SS:

        RONNY AGUILAR, being duly sworn, deposes and says that
he is a Special Agent with the United States Department of Health
and Human Services, Office of the Inspector General, duly
appointed according to law and acting as such.

        Upon information and belief, there is probable cause to
believe that in or about and between February 2009 and January
2010, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendant BORIS
SACHAKOV, together with others, did knowingly and willfully
execute a scheme and artifice to defraud Medicare and to obtain,
by means of materially false and fraudulent pretenses,
representations and promises, money and property owned by, and
under the custody and control of, Medicare and other Health Care
Benefits Programs, in connection with the delivery of and payment
for health care benefits, items and services.

(Title 18, United States Code, Sections 1347 and 3551
et seq.)

The source of your deponent's information and the
grounds for his belief are as follows:

1.   I am a Special Agent with the Department of Health
and Human Services, Office of the Inspector General ("HHS-OIG")
and am currently assigned to investigate health care fraud
violations, including schemes to defraud the Medicare program and
other health care benefit programs.  I have been an HHS-OIG
Special Agent for approximately four years.  During my tenure
with HHS-OIG, I have participated in a variety of criminal health
care fraud investigations involving schemes to defraud Medicare,
including schemes to bill for unnecessary treatment or services
that were not provided.  During the course of these
investigations, I have conducted physical surveillance; reviewed
Medicare claims data, bank records, and other business records;
and employed other investigative techniques.  I am familiar with
the records and documents maintained by health care providers,
and I am familiar with the laws and regulations related to the
administration of the Medicare program and other health care
benefit programs.

2.   Currently, I am assigned to one of the Medicare
Fraud Strike Force ("Strike Force") teams, which is staffed with
law enforcement agents and officers from the HHS-OIG and the

Federal Bureau of Investigation, as well as state and local investigators from the New York State Office of the Attorney General, Medicaid Fraud Control Unit, the New York City Police Department, and the New York City Human Resources Administration. The Strike Force is tasked with investigating criminal health care fraud cases involving the Medicare and Medicaid programs.

3. Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all of the relevant facts and circumstances of which I am aware. Additionally, except as otherwise noted, I have not differentiated between information about which I have personal knowledge, and information received from other sources.

The Health Care Benefit Programs

4. Medicare, 1199SEIU Benefit and Pension Funds ("1199SEIU"), Aetna, EmblemHealth (including GHI and HIP) ("Emblem"), The Empire Plan ("Empire"), Fidelis Care ("Fidelis"), Humana, Oxford Health Plans ("Oxford"), UnitedHealth Group ("United"), and Wellpoint, Inc. ("Wellpoint") (collectively, the "Benefit Programs") were public and private health insurance plans, affecting commerce, under which medical benefits, items, and services were provided to individuals.

5.    Each of the Benefit Programs was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

6.    The Benefit Programs compensated medical service providers for medical services that they actually rendered and were medically necessary.

7.    To receive reimbursement from the Benefit Programs, medical service providers submitted or caused the submission of claims, either electronically or in writing, to the Benefit Programs for payment of services, either directly or through a billing company.

Proctological Services Covered by the Benefit Programs

8.    The Benefit Programs covered the costs of proctological services including the treatment of hemorrhoids, office visits, anoscopies, proctosigmoidoscopies, hemorrhoidectomies, and the destruction of anal lesions.

9.    Hemorrhoids are swollen veins in the anal canal. The anal canal is approximately last 2 inches of the colon. Veins swelling inside the anal canal form internal hemorrhoids. Veins swelling near the opening of the anus form external hemorrhoids.

10.  An office visit, otherwise referred to as an evaluation and management service, includes services related to

5

taking a patient history, conducting an examination, and/or determining the appropriate course of medical treatment.

11.   An anoscopy is an examination of the anal canal using a short, rigid, hollow tube (anoscope) that may contain a light source.

12.   A proctosigmoidoscopy is an examination of the rectum and sigmoid colon (which is approximately the last 10 inches of the colon) using a flexible or rigid lighted tube (sigmoidoscope).   The proctosigmoidoscopy may involve, among things, dilation (or the expansion) of the colon with a balloon or guide wire, and the control of bleeding, usually by cauterization.   These more involved proctosigmoidoscopies may require moderate (conscious) sedation which is typically administered intravenously.   In preparation for a proctosigmoidoscopy, the patient may be instructed to follow a liquid diet for a day or two before the procedure or fast for up to 12 hours before the test.

13.   Hemorrhoidectomies, or the removal of hemorrhoids, may be performed different ways, including through:   (1) rubber band ligation, the tying off of a hemorrhoid at its base with rubber bands cutting off the blood flow to the hemorrhoid, causing it to shrink, die, and fall off in about a week; (2) excision, the surgical removal by cutting of the hemorrhoid;

and (3) destruction of the hemorrhoid by thermal energy, such as infrared heat.

14. The destruction of anal lesions (or abnormalities of tissue found near the anus) is performed by a variety of methods, such as laser surgery, electrosurgery, cryosurgery, or chemosurgery.

15. The reimbursement amounts that the Benefit Programs pay medical service providers for performing certain surgical procedures, such as hemorrhoidectomies, include payment for medical services that are related to those surgical procedures, such as preoperative and postoperative care. The surgical procedure and all related medical services are bundled together to form what is referred to as a "global surgical package." The Benefit Programs provide a single payment for all medical services that are bundled together in the global surgical package for a period of time called the "global period." For instance, under Medicare, the costs of all post-operative office visits for a hemorrhoidectomy and any surgical or other medical services that are required during the post-operative period because of any complications arising from that hemorrhoidectomy may be not billed separately to Medicare during the global period.

16. The global period for a hemorrhoidectomy by rubber band ligation is 10 days. The global period for a

hemorrhoidectomy by excision or destruction by thermal energy is 90 days.

17.  A medical service provider may not bill separately for medical services during the global period for a procedure unless such services are wholly unrelated to post-operative care and/or are clearly distinct and independent from the procedure.


Colon and Rectal Care of New York, PC

18.  The defendant BORIS SACHAKOV was a proctologist who practiced at Colon and Rectal Care of New York, PC ("CRCNY"), which does business at 2955 Brighton 4th Street, Brooklyn, New York.

19.  CRCNY was incorporated on or about October 27, 2005, with SACHAKOV as the registered agent and its sole shareholder, director, and officer.  On or about April 29, 2008, SACHAKOV signed a "Secretary's Certificate" indicating that he was the sole shareholder of CRCNY and also CRCNY'S President and Secretary.

20.  On or about February 1, 2008, SACHAKOV signed a lease agreement between BOSA Properties, LLC ("BOSA") and CRCNY. BOSA was incorporated on or about November 9, 2007, upon the filing of Articles of Organization signed by SACHAKOV as the Secretary.  SACHAKOV signed the lease agreement between BOSA and CRCNY for both the owner (BOSA) and the tenant (CRCNY).

21.    Between approximately October 27, 2005 and August
13, 2008, SACHAKOV submitted applications to Medicare seeking
authorization to submit reimbursement claims to Medicare through
CRCNY.  By signing these applications, SACHAKOV certified that he
would abide by all Medicare rules, regulations, and program
instructions.

22.    On or about September 26, 2008, SACHAKOV signed an
Electronic Funds Transfer (EFT) Authorization Agreement that
authorized Medicare to deposit by EFT reimbursement payments for
claims submitted by SACHAKOV into HSBC account XXXXX6490.  On May
9, 2007, SACHAKOV signed an EFT Authorization Agreement that
authorized Medicare to deposit reimbursement payments by EFT for
claims submitted by SACHAKOV into Washington Mutual account
XXXXXX2000.  SACHAKOV is the sole signatory for HSBC account
XXXXX6490 and Washington Mutual account XXXXXX2000.

23.    Several of the Benefit Programs began
investigating SACHAKOV after receiving complaints from patients
about SACHAKOV submitting claims for services that they did not
receive and/or based on suspicious billing patterns.  For
instance, Medicare initiated an investigation based on SACHAKOV's
pattern of billing for multiple hemorrhoidectomies along with
office visits and examinations on the same day for the same
patient on multiple occasions.  In order to bill for multiple
office visits, examinations, and hemorrhoidectomies that would

otherwise fall within the global period of one hemorrhoidectomy,
SACHAKOV consistently submitted claims for office visits,
examinations, and subsequent hemorrhoidectomies as if he were
treating distinct, unrelated conditions, when, in fact, he solely
was providing follow up services related to the initial
procedure.

The Fraudulent Scheme

24.   From approximately February 2009 through
approximately January 2010, SACHAKOV submitted voluminous claims
to Medicare for five proctological services including three
different types of hemorrhoidectomies (by rubber band ligation,
excision, and thermal energy) and two different anoscopies.   For
those five services in that time period, SACHAKOV billed Medicare
approximately $3,519,670 and was paid by Medicare approximately
$2,496,545.   For those same services in the same time period, the
next highest medical service provider in the entire United States
billed Medicare approximately $247,195 and was paid by Medicare
approximately $115,134.   The table below summarizes the top six
medical service providers in the United States for the five
proctological services described above from approximately
February 2009 through January 2010:

| Provider Initials | Provider State | Amount Billed | Amount Paid | Services Billed | Number of Claims |
|---|---|---|---|---|---|
| SACHAKOV | NY | $3,519,670 | $2,496,545 | 6,593 | 3,962 |
| B.G. | ME | $247,195 | $115,134 | 381 | 380 |
| L.M. | PA | $238,865 | $73,434 | 420 | 395 |
| R.G. | FL | $185,261 | $48,676 | 324 | 318 |
| H.G. | FL | $183,268 | $127,929 | 736 | 735 |
| A.K. | NY | $173,600 | $42,398 | 217 | 217 |

25.   Subsequently, investigators conducted an analysis
of the time it would have taken SACHAKOV if he actually performed
all of the services for which he billed the Benefit Programs.
This time analysis was based on the claims that SACHAKOV
submitted to Medicare, 1199SEIU, EmblemHealth, Fidelis, United,
and WellPoint for 2009.  For this analysis, each office visit,
examination, and surgical procedure was assigned a standardized
amounts of time.  The medical director of EmblemHealth, who is
also a board certified physician in internal medical, consulted a
colo-rectal surgical specialist and asked for the fastest time
such colo-rectal surgical procedures could be performed.  Office
visits were assigned amounts of time that are established by the
American Medical Association and adopted by insurance carriers,
including the Benefit Programs, as industry standards, which are
based on the history of the patient, the examination of the
patient, and how much time it should take a physician to diagnose
the patient and arrive at a treatment plan.  Based upon this

analysis, each examination (such as an anoscopy or proctosigmoidoscopy) and colo-rectal surgical procedure that was billed by SACHAKOV was deemed to last an average of 15 minutes.

26. Based on this time analysis, in 2009, SACHAKOV submitted a claim to Medicare, 1199SEIU, EmblemHealth, Fidelis, United, and/or WellPoint on 267 of the 365 days in 2009.  Not including holidays, there were 261 weekdays in 2009.  In 180 of the 267 days in which SACHAKOV submitted at least one claim, SACHAKOV billed for more than 24 hours.  In an additional 30 days, SACHAKOV billed for more than 20 hours.

27. According to a background questionnaire that SACHAKOV submitted to Medicare on or about October 22, 2009, CRCNY was open for business on Mondays from 9:00 a.m. to 9:00 p.m. (12 hours), on Tuesdays from 9:00 a.m. to 6:00 p.m. (9 hours), on Wednesdays from 9:00 a.m. to 6:00 p.m. (9 hours), on Thursdays from 9:00 a.m. to 9:00 p.m. (12 hours), and on Fridays from 10:00 a.m. to 5:00 p.m. (7 hours).  Of the 267 days on which SACHAKOV submitted at least one claim, SACHAKOV billed more than 12 hours on 249 days.

28. Based upon the applications he submitted, SACHAKOV was the only medical doctor who practiced at CRCNY.

29. During an interview with an Emblem investigator on or about October 26, 2009, SACHAKOV stated that he performs all of the surgeries and medical procedures.  During this interview,

SACHAKOV further stated that he completed the reimbursement
claims (or bills) and that he would complete the patient charts
based on what he had billed.

30.   The table below summarizes the claims data for six
Medicare patients for whom SACHAKOV purportedly provided the
highest number of hemorrhoidectomy procedures, from approximately
January 2007 through January 2010, including the approximate
number of hemorrhoidectomies, the approximate date range in which
those hemorrhoidectomies were purportedly performed, the
approximate number of medical services, including
hemorrhoidectomies, that SACHAKOV billed for those patients, and
the approximate amount of money that SACHAKOV billed Medicare for
those services:

| Medicare Patient Initials | Number of Hemorrhoidectomies | Date Range (No. of Months) | Total Number of Services | Amount Billed |
|---|---|---|---|---|
| L.K. | 85 | 5/08 to 1/10 (20 months) | 200 | $60,020 |
| Y.S. | 57 | 4/07 to 1/10 (33 months) | 143 | $37,415 |
| K.E. | 54 | 12/07 to 8/09 (21 months) | 113 | $31,040 |
| A.S. | 41 | 8/08 to 12/09 (16 months) | 106 | $37,185 |
| B.B. | 38 | 1/08 to 6/09 (18 months) | 80 | $22,035 |
| L.T. | 38 | 8/08 to 6/09 (10 months) | 95 | $31,675 |

31.  On or about October 22, 2009, Medicare investigators conducted an unannounced inspection of CRCNY.  As part of that inspection, Medicare investigators obtained copies of 138 patient charts from CRCNY.

32.  Based on a review of those 138 patient charts, Medicare investigators concluded that the reimbursement claims that SACHAKOV submitted for all 138 patients should have been denied.  In every patient chart, the actual documentation of what medical services were purportedly provided did not correspond with the medical services that SACHAKOV billed Medicare.

33.  For instance, SACHAKOV submitted separate claims for office visits and examination services that should have been bundled together in a global surgical package.  In submitting separate claims for office visits, which he unbundled from the global surgical package, SACHAKOV falsely stated that the office visits: (1) took place within the post-operative global period for a procedure but were for a reason or reasons that were unrelated to the original procedure; and/or (2) took place on the same day as a certain procedure but were for a separate, identifiable evaluation and management that is above and beyond the usual pre- and post-operative work of the procedure.  In separate claims for examination services, such as anoscopies and proctosigmoidoscopies, which he unbundled from the global surgical package, SACHAKOV indicated that the examinations:  (1)

were for a procedure or service that was distinct from other procedures or examinations on that same day; (2) were for an unplanned return to the operating/procedure room following the initial procedure during the postoperative period; and/or (3) took place within the postoperative global period but were for something that was unrelated to the original procedure or service.

34. In all 138 patient charts, however, there was insufficient documentation to support the separate claims for the office visits and examinations. Instead, the actual documentation in the patient charts indicated treatment or continuing treatment for hemorrhoids.

35. Additionally, SACHAKOV submitted claims for multiple hemorrhoidectomy procedures for the same patient that were allegedly performed on the same day indicating that such hemorrhoidectomies were: (1) distinct from other procedures or examinations on that same day; (2) for an unplanned return to the operating/procedure room following the initial procedure during the postoperative period; and/or (3) for something that was unrelated to the original procedure or service within the postoperative global period.

36. In all 138 patient charts, however, there was insufficient documentation to support the separate claims for the multiple hemorrhoidectomies.

37. Aside from Medicare, all of the other Benefit Programs received claims from SACHAKOV that followed the same billing pattern, i.e., claims for office visits, examinations, and hemorrhoidectomies for the same patient on the same day, where such medical services, that would otherwise be covered in a global period, are described as being separate unrelated and/or distinct services.

38. As part of this investigation, interviews were conducted by law enforcement officials of patients who submitted complaints to the Benefit Programs about SACHAKOV.

Patient E.Y.

39. SACHAKOV submitted a reimbursement claim for patient E.Y. indicating that, on April 22, 2008, SACHAKOV conducted an office visit, a proctosigmoidoscopy, and a hemorrhoidectomy for E.Y., who was then covered by Emblem. SACHAKOV billed Emblem for an office visit which SACHAKOV claimed involved taking a comprehensive history, conducting a comprehensive examination, and involving a highly complex medical decision or decisions that took about 80 minutes. SACHAKOV billed Emblem for a purported proctosigmoidoscopy involving moderate (conscious) sedation. SACHAKOV billed Emblem for a purported hemorrhoidectomy involving the excision of an internal or external hemorrhoid. If they occurred, the office visit and

16

the proctosigmoidoscopy, should have been covered in the global

surgical package for the hemorrhoidectomy.  However, in order to

bill for the office visit separately, SACHAKOV indicated that the

office visit was for a significant, separately identifiable

office visit that was above and beyond what was necessary for the

hemorrhoidectomy.  Similarly, in order to bill for the

proctosigmoidoscopy separately, SACHAKOV further indicated that

the proctosigmoidoscopy was distinct and independent from the

office visit and the hemorrhoidectomy.

        40.  On or about June 29, 2010, patient E.Y. was

interviewed by law enforcement officials.  E.Y. indicated that

E.Y. saw SACHAKOV because he/she was experiencing some rectal

bleeding.  E.Y. stated that SACHAKOV's examination lasted

approximately 2 minutes.  Afterwards, SACHAKOV performed an

anoscopy, told E.Y. that the condition was minor and required no

further treatment, and then prescribed E.Y. an ointment.

Afterwards, E.Y. received correspondence from Emblem which

indicated that SACHAKOV submitted claims for an office visit,

proctosigmoidoscopy, and a hemorrhoidectomy.  E.Y. knows the

difference between an anoscopy and a proctosigmoidoscopy because

E.Y. is a registered nurse.  E.Y. also stated that he/she

underwent a hemorrhoidectomy in the past at a different medical

facility, and that the previous procedure lasted approximately 40

minutes although E.Y. was at the hospital for approximately five

hours, and that it took E.Y. three days before he/she could walk unassisted.   E.Y. called SACHAKOV's office to complain because he/she did not receive a proctosigmoidoscopy or a hemorrhoidectomy.   E.Y. was informed that the purpose of the over-billing was to ensure that the insurance carrier would pay the proper amount given that the insurance carrier usually did not cover the actual claims.

Patient L.F.

41.   SACHAKOV submitted a reimbursement claim for patient L.F. indicating that, on September 9, 2009, he performed an office visit, an anoscopy, a hemorrhoidectomy and a procedure for the destruction of anal lesions for L.F. who was then covered by Fidelis.   If they occurred, the office visit, anoscopy, and the destruction of lesions should have been covered in the global surgical package for the hemorrhoidectomy.   In order to bill for the office visit separately, SACHAKOV indicated that the office visit was for a significant, separately identifiable office visit that was above and beyond what was necessary for the hemorrhoidectomy.   Similarly, in order to bill for the anoscopy and the destruction of lesions, SACHAKOV further indicated that these procedures were distinct and independent from the office visit and the hemorrhoidectomy.

42.   On or about June 18, 2010, patient L.F. was interviewed by law enforcement officials.  L.F. indicated that SACHAKOV performed an examination of L.F.'s rectal area and asked L.F. whether L.F. wanted surgery.  SACHAKOV described the surgery and told L.F. that L.F. would experience discomfort and have trouble sitting.  L.F. decided not to have any surgery. Nevertheless, SACHAKOV submitted a claim to Fidelis indicating that he performed two surgical procedures on L.F. - a hemorrhoidectomy and the destruction of anal lesions.

Patient D.O.

43.   SACHAKOV submitted a claim for patient D.O. indicating that on September 9, 2009, SACHAKOV conducted an office visit and performed a proctosigmoidoscopy and a hemorrhoidectomy on patient D.O. who was then covered by GHI. SACHAKOV billed GHI for an office visit which purportedly involved taking a detailed history, conducting a detailed examination, and involving a medical decision-making of low complexity that takes about 40 minutes.  SACHAKOV billed GHI for a purported proctosigmoidoscopy involving moderate (conscious) sedation.  SACHAKOV billed GHI for a purported hemorrhoidectomy involving the excision of an internal or external hemorrhoid.  If they occurred, the office visit and the proctosigmoidoscopy should have been covered in the global surgical package for the

19

hemorrhoidectomy.  In order to bill for the office visit
separately, SACHAKOV indicated that the office visit was for a
significant, separately identifiable office visit that was above
and beyond what was necessary for the hemorrhoidectomy.
Similarly, in order to bill for the proctosigmoidoscopy
separately, SACHAKOV further indicated that the
proctosigmoidoscopy was distinct and independent from the office
visit and the hemorrhoidectomy.

44.  On or about June 21, 2010, patient D.O. was
interviewed by law enforcement officials.  D.O. visited the
offices of SACHAKOV only one time in early September 2009.  D.O.
was examined by a nurse practitioner, and not SACHAKOV, for
approximately five to six minutes during which D.O. indicated
that nothing was inserted into D.O.'s anus, and D.O. received no
injections of any kind.  The nurse practitioner told D.O. that
D.O. had a "fissure," and prescribed D.O. some Benefiber, cocoa
butter suppositories and an ointment.  D.O. made an appointment
to return in about one month.  Subsequently, someone from CRCNY
called D.O. and told D.O. that CRCNY no longer accepted D.O.'s
insurance carrier, GHI, and asked that D.O. not return to CRCNY.

Patient I.L.

45.  SACHAKOV submitted a claim for patient I.L.
indicating that on September 2, 2009, SACHAKOV conducted an

office visit and performed a proctosigmoidoscopy and a
hemorrhoidectomy on patient I.L. who was then covered by GHI.
SACHAKOV billed GHI for an office visit purportedly involving
taking a detailed history, conducting a detailed examination, and
involving a medical decision-making of low complexity that takes
about 40 minutes.   SACHAKOV billed GHI for a proctosigmoidoscopy
involving moderate (conscious) sedation.   SACHAKOV billed GHI for
a hemorrhoidectomy involving the excision of an internal or
external hemorrhoid.   If they occurred, the office visit and the
proctosigmoidoscopy should have been covered in the global
surgical package for the hemorrhoidectomy.   In order to bill for
the office visit separately, SACHAKOV indicated that the office
visit was for a significant, separately identifiable office visit
that was above and beyond what was necessary for the
hemorrhoidectomy.   Similarly, in order to bill for the
proctosigmoidoscopy separately, SACHAKOV further indicated that
the proctosigmoidoscopy was distinct and independent from the
office visit and the hemorrhoidectomy.

        46.   On or about June 24, 2010, patient I.L. was
interviewed by law enforcement officials.   I.L. visited the
offices of SACHAKOV only one time in early September 2009.   I.L.
stated that he/she never saw SACHAKOV during I.L.'s sole visit to
CRCNY.   Instead, someone with a different first name examined
I.L. along with another man in a blue nurse's outfit.   I.L.

stated that I.L. was not touched in his/her rectal area during the examination.  Afterwards, the examiner told I.L. that I.L. had a small hemorrhoid, prescribed I.L. a cream, and advised I.L. to make a new appointment if the problem persisted.  I.L. stated that the examination lasted approximately five to six minutes.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for defendant BORIS SACHAKOV so that he may be dealt with according to law.  Your deponent further requests that, due to the nature of this application, this affidavit and warrant be filed under seal until SACHAKOV has been taken into custody pursuant to the instant arrest warrant.

RONNY AGUILAR
Special Agent
United States Department of
        Health and Human Services
Office of the Inspector General

Sworn to before me this
7 day of September, 2010

HON. STEVEN M. GOLI
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK