JEG:PNK:JVH
F.#2010R01452

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

BORIS SACHAKOV, M.D.,

        Defendant.

- - - - - - - - - - - - - - - - X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★  FEB 1 6 2011  ★

**BROOKLYN OFFICE**

I N D I C T M E N T

CR 11 - 0120

(T. 18, U.S.C., §§ 982(a)(7),
982(b), 1347, 2 and 3551 et
seq.)

**WEINSTEIN, J.**

GO, M.J.

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

The Medicare Program

    1.   The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

    2.   Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b) and referenced in Title 18, United States Code, Section 1347.

2

3.   Medicare was subdivided into multiple Parts. Medicare Part B covered the costs of physicians' services and outpatient care, such as physical therapy, occupational therapy, and diagnostic tests.  Generally, Medicare Part B covered these costs if, among other requirements, they were medically necessary and ordered by a physician.

4.   Medical providers certified to participate in Medicare, whether clinics or individuals, were assigned a provider identification number ("PIN") for billing purposes. After a medical provider rendered a service, the provider used its PIN when submitting a claim for payment to the Medicare contractor or carrier assigned to that provider's state.

5.   Medical providers were authorized to submit claims to Medicare only for services they actually rendered and were required to maintain patient records verifying the provision of services.

6.   To receive payment from Medicare for a covered service, a medical provider was required to submit a claim, either electronically or in writing, through Form CMS-1500 or UB-92.  The claim was required to include information identifying the medical provider, the patient and the services rendered.  In submitting the claim, the provider certified, among other things, that the services were rendered to the patient and were medically necessary.

The Private Health Care Benefit Programs

7.    The 1199SEIU Benefit and Pension Funds, Aetna,
EmblemHealth (including General Health Insurance ("GHI") and
Health Plan of New York ("HIP")), The Empire Plan, Fidelis Care,
Humana, Oxford Health Plans, UnitedHealth Group, and Wellpoint,
Inc. (collectively, the "Private Benefit Programs") were private
health insurance plans, affecting commerce, under which medical
benefits, items, and services were provided to individuals.

8.    Each of the Private Benefit Programs was a "health
care benefit program" as defined by Title 18, United States Code,
Section 24(b) and referenced in Title 18, United States Code,
Section 1347.

9.    The Private Benefit Programs compensated medical
service providers for medical services that they actually
rendered and were medically necessary.

10.   To receive reimbursement from the Private Benefit
Programs, medical service providers submitted or caused the
submission of claims, either electronically or in writing, to the
Private Benefit Programs for payment of services, either directly
or through a billing company.

4

Services Covered by Medicare and the Private Benefit Programs

11.   Medicare and the Private Benefit Programs cover the costs of proctological services including the treatment of hemorrhoids, office visits, anoscopies, proctosigmoidoscopies, hemorrhoidectomies, and the destruction of anal lesions.

12.   An office visit, otherwise referred to as an evaluation and management service, includes services related to taking a patient history, conducting an examination, and/or determining the appropriate course of medical treatment.

13.   An anoscopy and a proctosigmoidoscopy are examinations of, respectively, the anal canal and the rectum and sigmoid colon.

14.   Hemorrhoidectomies, or the removal of hemorrhoids, may be performed in different ways, including rubber band ligation, surgical removal and destruction by thermal energy.

15.   The destruction of anal lesions is performed by a variety of methods, such as laser surgery or chemosurgery.

16.   The reimbursement amounts that Medicare and the Private Benefit Programs pay medical service providers for performing certain surgical procedures, such as hemorrhoidectomies, include payment for medical services that are related to those surgical procedures, such as preoperative and postoperative care.  The surgical procedure and all related medical services are bundled together to form what is referred to

as a "global surgical package."  Medicare and the Private Benefit
Programs provide a single payment for all medical services that
are bundled together in the global surgical package for a period
of time called the "global period."

17.  A medical service provider may not bill separately
for medical services during the global period for a procedure
unless such services are wholly unrelated to post-operative care
or are clearly distinct and independent from the procedure.

18.  For instance, under Medicare, the costs of all
post-operative office visits for a hemorrhoidectomy and any
surgical or other medical services that are required during the
post-operative period because of any complications arising from
that hemorrhoidectomy may not be billed separately to Medicare
during the global period.

19.  The global period for a hemorrhoidectomy by rubber
band ligation is 10 days.  The global period for a
hemorrhoidectomy by excision or destruction by thermal energy is
90 days.

Colon and Rectal Care of New York, P.C.

20.  Colon and Rectal Care of New York, P.C. ("CRCNY"),
was a New York State corporation doing business in Brooklyn, New
York.  CRCNY was certified to participate in Medicare.  It
purported to provide, among other things, proctological services
including examinations and hemorroidectomies.

## The Defendant

21.   The defendant BORIS SACHAKOV, M.D., was a
proctologist who formed, owned, operated, and practiced at CRCNY.
SACHAKOV was CRCNY's registered agent and its sole shareholder,
director, and officer.

22.   From approximately January 2008 through
approximately January 2010, the defendant BORIS SACHAKOV,
together with others, under the provider numbers of CRCNY, caused
the submission of approximately $6,578,346 in claims to Medicare
and approximately $16,008,850 in claims to the Private Benefit
Programs, allegedly for services provided to beneficiaries.
Medicare paid approximately $4,465,003 of these claims and the
Private Benefit Programs paid approximately $5,883,171.

## The Fraudulent Scheme

23.   From approximately January 2008 through
approximately January 2010, the defendant BORIS SACHAKOV,
together with others, caused the submission of millions of
dollars in false and fraudulent claims to Medicare and the
Private Benefit Programs for services to beneficiaries that were
not performed.

24.   Further, in order to bill for multiple office
visits, examinations, and hemorrhoidectomies that would otherwise
fall within the global period of one hemorrhoidectomy, the
defendant BORIS SACHAKOV submitted claims for office visits,

examinations, and subsequent hemorrhoidectomies as if he were treating distinct, unrelated conditions, when, in fact, to the extent any of these services occurred, SACHAKOV merely provided follow up services related to the initial procedure which could not be billed separately.

## COUNTS ONE THROUGH FIVE
### (Health Care Fraud)

25.  The allegations contained in paragraphs 1 through 24 are realleged and incorporated as if fully set forth in this paragraph.

26.  On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendant BORIS SACHAKOV, together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud one or more health care benefit programs, to wit:  Medicare and the Private Benefit Programs, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of Medicare and the Private Benefit Programs, in connection with the delivery of and payment for health care benefits, items and services.

| Count | Beneficiary | Approximate Date of Service | Services Billed | Benefit Program | Approximate Claim Amount |
|-------|-------------|------------------------------|-----------------|-----------------|--------------------------|
| One | Y.R. | 12/01/08 | Office visit; anoscopy; hemorrhoidectomies. | Medicare | $1,520 |
| Two | E.Y. | 04/22/08 | Office visit; Proctosigmoidoscopy; hemorrhoidectomy. | EmblemHealth | $2,340 |
| Three | L.F. | 09/09/09 | Office visit; anoscopy; hemorrhoidectomy; destruction of anal lesions. | Fidelis Care | $2,600 |
| Four | D.O. | 09/09/09 | Office visit; Proctosigmoidoscopy; hemorrhoidectomy. | GHI | $1,380 |
| Five | I.L. | 09/02/09 | Office visit; Proctosigmoidoscopy; hemorrhoidectomy. | GHI | $1,380 |

(Title 18, United States Code, Sections 1347, 2 and

3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

27.   The United States hereby gives notice to the

defendant that, upon his conviction of any of the offenses

charged in this Indictment, the government will seek forfeiture

in accordance with Title 18, United States Code, Section

982(a)(7), which requires any person convicted of such offenses

to forfeit any property, real and personal, that constitutes or

is derived, directly or indirectly, from gross proceeds traceable

to the commission of the offenses, including but not limited to a

sum of money in United States currency, in an amount to be

determined at trial, for which the defendant is jointly and

severally liable.

28.   If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

(a)   cannot be located upon the exercise of due

diligence;

(b)   has been transferred or sold to, or deposited

with, a third party;

(c)   has been placed beyond the jurisdiction of

the court;

(d)   has been substantially diminished in value;

or

(e)   has been commingled with other property which

cannot be divided without difficulty; it is the intent of the

United States, pursuant to Title 18, United States Code, Section

982(b)(2), to seek forfeiture of any other property of such

defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(7), 982(b))

A TRUE BILL

_____
FOREPERSON

_____
LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

DENIS J. MCINERNEY
CHIEF CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

F. #2011ROO213
FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL  DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*BORIS SACHAKOV, M.D.,* Defendant.

# INDICTMENT
(T. 18, U.S.C., §§  1347, 982(a)(7), 2 and 3551 et seq.,)

*A true bill.*

_____
                                                        *Foreman*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                                        *Clerk*

*Bail, $* _____

_____

*Peter Katz, Trial Attorney (718) 254-6377*